UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| KUHNS BROTHERS, INC., KUHNS BROTHERS SECURITIES CORP., and KUHNS BROS. & CO. INC., Plaintiffs, vs. FUSHI INTERNATIONAL, INC., f/k/a DALIAN FUSHI BIMETALLIC MANUFACTURING COMPANY LTD., Defendant. | Civil No. 3:06cv1917 (PCD) |

**RULING ON DEFENDANT'S MOTION TO DISMISS**

Plaintiffs Kuhns Brothers, Inc. ("Kuhns Brothers"), Kuhns Brothers Securities Corp. ("KBSC") and Kuhns Bros. & Co. Inc. ("Kuhns Bros. & Co.") (collectively, the "Kuhns Entities") bring this action seeking a declaratory judgment and alleging breach of contract of an agreement to provide investment banking services. Defendant moves, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiff's Amended Complaint in its entirety. For the reasons that follow, Defendant's Motion to Dismiss [Doc. No. 16] is **denied**.

**I.    BACKGROUND**[1]

The Kuhns Entities provide financial and investment advisory services, and are headquartered in Lime Rock, CT. (Am. Compl. ¶ 1.) Defendant Fushi International, Inc. ("Fushi") is a Nevada Corporation engaged in the manufacture and sale of bimetallic products

---

[1] The court takes the facts alleged in the Amended Complaint as true, as it must, and draws all inferences in Plaintiffs' favor. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974).

with headquarters in Dalian, China. (Id. ¶ 2.) According to the Amended Complaint, Defendant was formerly known as Dalian Fushi Bimetallic Manufacturing Company, Ltd. ("Dalian Fushi"), and through the efforts of Plaintiffs, Defendant's shares now trade in the United States under the symbol FSIN. (Id.) Defendant retained Plaintiffs through a contract, the "Engagement Agreement" (the "Agreement'") dated May 27, 2005, to provide investment banking and advisory services. (Id. ¶ 4.) Under the terms of the Agreement, Plaintiffs were to effectuate the financing and related merger transaction of acquiring a public company, listed on a stock exchange in the United States, through a reverse merger[2] with Dalian Fushi. (Id. ¶ 5.) The preamble to the Agreement reads:

> [Dalian Fushi] hereby engages Kuhns Brothers on an exclusive basis, initially for the six month period commencing the date hereof, to provide it with investment banking services, and Kuhns Brothers hereby accepts such engagement. In the event [that] as a result of this initial engagement Kuhns Brothers successfully arranges and [closes] the financings and related merger acquisition described below ("the Closing"), this Agreement will remain in force for a period of two years following the closing of such financing and related transactions.

(Agreement 7.[3])

The Closing, as defined in the preamble, occurred on December 28, 2005. (Am. Compl. ¶ 6.) The Closing initiated a two-year extension of the terms of the Agreement (through December

---

[2] "A reverse merger is a transaction in which a publically held company has no business purpose other than to find a private company to acquire, has no assets (other than possibly cash), and has nominal business operations. For this reason, such a public company is a called a shell. At the end of the reverse merger, the private company is held publically, instantly." Feldman, David N. Reverse Merger: Taking a Company Public Without an IPO. 21 (2006).

[3] A court ruling on a motion to dismiss may consider documents incorporated into the complaint by reference. See Gryl ex rel. Shire Pharms. Group Plc v. Shire Pharms. Group Plc, 298 F.3d 136, 140 (2d Cir. 2002); Newman & Schwartz v. Asplundh Tree Expert Co., 102 F.3d 660, 662 (2d Cir. 1996). The "Engagement Agreement," attached to Defendant's Motion to Dismiss as Exhibit A, is explicitly relied on in and is integral to the Amended Complaint, and therefore has been incorporated by reference. Accordingly, it is appropriately considered here.

28, 2007), pursuant to which Plaintiffs retain certain rights, including the right to a "non-refundable monthly retainer of $10,000 per month . . . for strategic and financial advisory services" pursuant to Section II(iii)(b), and the right to provide investment banking services pursuant to Section V. (Agreement 13, 15.) Defendant paid the monthly retainer through August 29, 2006, when it sent Plaintiffs a notice claiming it was exercising its right to terminate the Agreement under Section VII, (Am. Compl. ¶¶ 10, 19), which provides in relevant part:

> The term of Kuhns Brothers' engagement hereunder shall extend from the date hereof until terminated as set forth below. Subject to the provision of this Agreement that shall survive any termination or expiration of the understanding between the parties, either party may terminate Kuhns Brothers' engagement hereunder at any time by giving the other party at least 10 days written notice.

(Agreement 17.) Defendant has since refused to pay sums that Plaintiffs claim they owe under the contract, including the $10,000 monthly retainer provided for in Section II(iii)(b) of the Agreement.

On January 25, 2007, Defendant consummated a transaction with Citadel Equity Fund, Ltd. ("Citadel"), pursuant to which it obtained $60 million of financing through Citadel's purchase of Defendant's secured Notes (the "Citadel Transaction"). (Am. Compl. ¶ 11.) Defendant did not request that Plaintiffs provide investment banking services for the Citadel Transaction, as Plaintiffs contend it was required to do under Section V of the Agreement. (See Agreement 14 ("[Dalian Fushi] agrees that Kuhns Brothers shall have the right . . . to provide investment banking services to [Dalian Fushi] on an irrevocable preferential right of refusal basis to provide such services in relation to [Dalian Fushi's] financing for the term of this Agreement . . .").) Plaintiffs contend that they were "ready, willing and able to provide such investment banking services." (Am. Compl. ¶ 13.) Sections II(i) and V of the Agreement require Defendant

to pay Plaintiffs a fee equal to 50% of the compensation that would be due if Plaintiffs had introduced the third party to Defendant. (See Agreement 11 ("if during 2 years from the execution of this contract a Financing is consummated with a third party not introduced to the Company by Kuhns Brothers, Kuhns Brothers will be paid a fee equal to 50% of its compensation due pursuant to the language above"), 14 ("In the event Kuhns Brothers agrees to provide such investment banking services, Kuhns Brothers shall be paid as described in paragraph II above."); see also Am. Compl. ¶ 15.) Defendant has refused to pay this financing fee, which, with regard to the Citadel Transaction, would be approximately $3 million. (See Am. Compl. ¶ 16.)

On November 27, 2006, the Kuhns Entities filed suit in this Court, seeking a declaratory judgment that the Agreement will not terminate earlier than December 28, 2007, as well as $3,150,000 in damages. (See Am. Compl.¶ 23.) Plaintiffs amended the complaint on February 6, 2007, adding a breach of contract claim arising from the Citadel Transaction and Defendant's repudiation of its obligation to pay the monthly retainer. (See Am. Compl. ¶¶ 18, 19, 20.)

On or about March 5, 2007, Defendant moved to dismiss the First Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Defendant claims that this Court lacks subject matter jurisdiction under Rule 12(b)(1) on the ground that Plaintiffs lacks standing to sue Defendant, arguing that there is no privity of contract between the Kuhns Entities and Fushi. (Def.'s Mot. Dismiss 1.) Defendant also claims that Plaintiffs have failed to state a claim for which relief can be granted under Rule 12(b)(6), because Plaintiffs seek to enforce obligations under a contract that was properly terminated as a matter of law. (Id. at 2.)

## II.   STANDARD OF REVIEW

A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. See Fed. R. Civ. P. 12(b)(1). Plaintiff, as the party asserting subject matter jurisdiction, has the burden of establishing by a preponderance of the evidence that it exists, Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996), and the court should not draw argumentative inferences in its favor. Atlantic Mutual Ins. Co. v. Balfour MacLaine Int'l, 968 F.2d 196, 198 (2d Cir. 1992); see also Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994) (The Court will "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations" but "will not draw 'argumentative inferences' in the plaintiff's favor"). Unlike with a Rule 12(b)(6) motion, a court resolving a Rule 12(b)(1) motion for lack of subject matter jurisdiction may refer to evidence outside the pleadings. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (citing Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986)); see also Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000) (in resolving a Rule 12(b)(1) motion, district courts may "resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing"). A court must "look to the substance of the allegations to determine jurisdiction." Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1019 (2d Cir. 1993).

The function of a motion to dismiss pursuant to Rule 12(b)(6) "is merely to assess the legal feasibility of the complaint, not to assay the weight of evidence that might be offered in support thereof." Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir. 1984) (citation omitted). Therefore, when considering such a motion, the court must accept the facts alleged in the complaint as true, draw inferences therefrom in the light most

favorable to the plaintiff, and construe the complaint liberally. Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001). The district court may dismiss a claim under Federal Rule of Civil Procedure 12(b)(6) only if the plaintiff's factual allegations are not sufficient "to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, ___ U.S. ___, 127 S. Ct. 1955, 1960, 167 L. Ed. 2d 929 (2007). Although detailed factual allegations are not required, a plaintiff must provide the grounds of her entitlement to relief beyond mere "labels and conclusions"; "a formulaic recitation of the elements of a cause of action will not do." Id. at 1964-65.[4] In ruling on a motion to dismiss under Rule 12(b)(6), the Court may consider only the allegations made in the complaint, documents attached to the complaint, documents incorporated into the complaint by reference, and any facts of which judicial notice may be taken. See Newman & Schwartz v. Asplundh Tree Expert Co., 102 F.3d 660, 662 (2d Cir. 1996); Brass v. Amer. Film Techn., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

Where, as here, a party moves to dismiss pursuant to Rule 12(b)(1) in addition to other bases, "the court should consider the Rule (12)(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." Rhulen Agency, Inc. V. Alabama Ins. Guaranty Ass'n., 896 F.2d 674, 678 (2d Cir. 1990).

## III. DISCUSSION

---

[4] The Second Circuit recently questioned the extent to which Bell Atlantic applies outside of that specific antitrust context. See Iqbal v. Hasty, __ F.3d __, 2007 U.S. App. LEXIS 13911, 2007 WL 1717803, at *11 (2d Cir. June 14, 2007). The Iqbal Court adopted a "flexible plausibility standard," which "obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." Id. Here, the Court need not determine whether such amplification is required, as the Amended Complaint is sufficient under the heightened pleading standard set forth in Bell Atlantic.

6

A.  Standing

Defendant first argues that Plaintiffs inadequately pled successor liability and therefore lack standing to pursue a claim against Defendant, which is not a party to the Agreement. (See Def.'s Mot. Dismiss 1; Def.'s Reply 3-5.)  A court must dismiss a claim pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction if the plaintiff lacks standing to pursue the action. See United States Fid. & Guar. Co. v. S.B. Phillips Co. Inc., 359 F. Supp. 2d 189, 199 (D. Conn. 2005); In re United States Catholic Conference, 885 F.2d 1020, 1023 (2d Cir. 1989).  "[W]hen standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable." Flast v. Cohen, 392 U.S. 83, 99-100, 88 S. Ct. 1942, 1952, 20 L. Ed. 2d 947 (1968). "[W]hen standing is challenged on the basis of the pleadings, we 'accept as true all material allegations of the complaint, and . . . construe the complaint in favor of the complaining party.'"  Pennell v. San Jose, 485 U.S. 1, 7, 108 S. Ct. 849, 855, 99 L. Ed. 1 (1988) (citation omitted).

Plaintiffs have simply pled that Defendant "was formerly known as Dalian Fushi Bimetallic Manufacturing Company Ltd.," which is not a party to this action.[5] (Am. Compl. ¶ 2.) Although sparse, Rule 8 requires only "a short and plain statement of the claim." Fed. R. Civ. P. 8(a).  The court in Sealy Connecticut, Inc. v. Litton Industries, Inc., 989 F. Supp. 120 (D. Conn. 1997), found a successor liability claim was adequately pled when only a bare allegation was made that the defendants were successors in interest. Id. at 122-23.  Pleading of a successor

---

[5] Plaintiffs have moved for leave to amend the Amended Complaint to add Dalian Fushi as a defendant.  The parties agreed to stay the briefing of that motion until after the Court ruled on the instant motion to dismiss.

7

liability claim in Connecticut need not contain specific facts or go beyond the notice pleading requirements of Rule 8. See Infra-Metals, Co. v. Topper & Griggs Group, Inc., No. 3:05-cv-559 (JCH), 2005 WL 3211385, at *2 (D. Conn. Nov. 30, 2005). In Infra-Metals, the complaint adequately alleged successor liability by simply stating that the creditor transferred to the defendant "substantially all of its assets;" the court did not require the plaintiff to establish the "factual predicates of successor liability exceptions." Id. at *1, *3. The potential bases for successor liability in Connecticut are as follows:

> Under the general rule, a corporation which purchases all the assets of another company does not become liable for the debts and liabilities of its predecessor unless (1) the purchase agreement expressly or impliedly so provides; (2) there was a merger or consolidation of the two firms; (3) the purchaser is a "mere continuation" of the seller; or (4) the transaction is entered into fraudulently for the purpose of escaping liability.

Id. at *2 (quoting Ricciardello v. J.W. Gant & Company, 717 F. Supp. 56, 57-58 (D. Conn. 1989)).[6]

Infra-Metals and Sealy Connecticut suggest that Plaintiffs need not plead specific facts to establish any of the exceptions to successor liability, which are treated as "multi-factor balancing

---

[6] Defendant's argument that it is not a party to the Agreement does not affect the standing inquiry, because Plaintiffs plead that Defendant is a successor in interest to Dalian Fushi, which clearly is a party to the contract upon which Plaintiffs are signed parties. The cases Defendant cites all found that the plaintiffs lacked standing because there was no privity of contract, however, the cases all involved contracts to which the plaintiffs were not signatories or intended beneficiaries. See, e.g., United States Fid. & Guar. Co., 359 F. Supp. 2d at 199-200; Christ-Janer v. A.F. Conte and Co., Inc., 8 Conn. App. 83, 90, 511 A.2d 1017, 1021 (1986); Coburn v. Lenox Homes, Inc., 186 Conn. 370, 371, 441 A.2d 620, 622 (1982). Plaintiffs are clearly parties to the Agreement at issue here and have adequately plead successor liability for standing purposes. The question of whether Defendant is actually a successor in interest to Dalian Fushi is a question of fact that need not be resolved at this stage.

8

tests." See id. at *3.[7]  Under Sealy Connecticut, Plaintiffs do not need to use the words "successor liability" for the pleading to adequately allege successor liability. The bare allegation that Fushi was formerly known as Dalian Fushi, and therefore a successor in interest, is sufficient to satisfy Rule 8. See Sealy Conn., 989 F. Supp. at 122-23.  Defendant cites Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc., 170 F.R.D. 361 (S.D.N.Y. 1997), where the court dismissed fraud claims that inadequately pled successor liability, finding that the simple pleading of a legal conclusion—i.e., "upon information and belief, each of the . . . defendants which presently exists is an alter ego and/or successor corporation to those . . . defendants that have been dissolved or terminated"—is insufficient to stave off dismissal, even under Rule 8(a). Id. at 376.  The Old Republic court noted that the plaintiff made "no attempt to demonstrate that any . . . defendant is, in fact, a successor corporation to a previously existing . . . entity." Id.  Old Republic, however, involves New York law, whereas this action arises under Connecticut law. Infra Metals and Sealy Connecticut, both applying Connecticut law, are more applicable here.

Plaintiffs' allegation that Defendant "was formerly known as Dalian Fushi Bimetallic Manufacturing Company Ltd.," (Am. Compl. ¶ 2), is sufficient to satisfy the pleading requirements of Rule 8(a). See Infra Metals, 2005 WL 3211385 at *2; Sealy Conn., 989 F. Supp. at 122-23.[8]  The Amended Complaint is sufficient to notify Defendant that it is being held liable

---

[7] Defendant asserts that the court in Infra-Metals ordered the plaintiff to replead specific facts to support its successor liability claim. (Def.'s Reply 4.)  The plaintiff in that case was only required to replead facts if it wished to establish a *fraud* theory based on a successor liability claim, which must be pleaded with "particularity" under Rule 9(b). Infra-Metals, 2005 WL 3211385 at *3 n.4. Rule 9(b)'s heightened pleading requirements for fraud clearly do not apply in this case.

[8] Even if Old Republic did control and Plaintiffs were required to produce evidence going to show that Defendant is a successor corporation to Dalian Fushi, Plaintiffs have produced evidence sufficient to satisfy that standard.  In their Sur-reply Memorandum in Opposition to Defendant's Motion to Dismiss, Plaintiffs incorporate their Motion for Prejudgment Remedies, which sets forth evidence of successor liability. (See Pls.' Surreply 4; Pls.' Mot. Prej. Rem. 7-8.)  Plaintiffs also

9

for the debts of Dalian Fushi under the Agreement. The claim that Defendant was formerly known as Dalian Fushi must be taken as true, and that allegation, combined with the evidence provided to show that Defendant is a successor corporation, indicates that Plaintiffs have standing, under Connecticut law, to bring claims arising out of the Agreement against Defendant. The question of whether Defendant is *actually* a successor in interest to Dalian Fushi is a question of fact and need not be resolved at this stage of the litigation.

B.   **Breach of Contract**

The motion to dismiss presents questions of contract interpretation. The standard for interpretation of contracts in Connecticut has been articulated as follows:

> A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The intent of the parties is to be ascertained by a fair and reasonable construction of the written words and the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity. Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms.

Tallmadge Bros. v. Iroquois Gas Transmission Sys., L.P., 252 Conn. 479, 498, 746 A.2d 1277, 1288 (2000) (internal alterations and citations omitted). The contract must be read and considered as a whole, so that every provision is given effect if reasonably possible. United States Fid. & Guar. Co., 359 F. Supp. 2d at 200.

Ordinarily the interpretation of contractual language is a question of fact, however,

---

submit Defendant's SEC Form 8-K, dated December 13, 2005, in which Defendant describes the transfer of assets from Dalian Fushi to Dalian DPI, a subsidiary of Defendant. (See Def.'s SEC Form 8-K for FY05 at 2, Ex. A to Fleming Decl.)

interpretation of intent is a question of law and limited to the terms of the contract only where the contractual language is "clear and unambiguous." United States Fid. & Guar. Co., 359 F. Supp. 2d at 200-201; ARB Construction LLC v. Pinney Construction Corp., 75 Conn. App. 151, 154, 815 A.2d 709, 709 (2003). "Contract language is unambiguous when it has a definite and precise meaning about which there is no reasonable basis for a difference of opinion." Christian v. Gouldin, 72 Conn. App. 14, 20, 804 A.2d 865 (2002) (internal quotation marks omitted). "If the agreement is subject to more than one reasonable interpretation and extrinsic evidence of the actual intent of the parties exists, then the contract's meaning becomes an issue for the factfinder." Brunoli v. Brunoli & Sons, 993 F. Supp. 66, 73 (D. Conn. 1997).

The language of the Agreement is presumed to be definitive, since the contract at issue is between sophisticated parties and is commercial in nature. See Tallmadge, 252 Conn. at 496-97 (the fact that "the contracts at issue are commercial in nature and were made by sophisticated commercial parties with the advice of counsel during an extensive drafting process" raises "a presumption of definitiveness that" can be "rebutted by . . . other evidence in the record").

### 1. Termination of the Agreement

Defendant claims that the language of Section VII of the Agreement clearly and unambiguously permits either party to unilaterally terminate the entire "Agreement" upon ten days notice. (Def.'s Mem. Supp. Mot. Dismiss 7.) Plaintiff contends that the relevant clause in Section VII only allows for termination of the "engagement," which refers to the work leading up to the Closing of the financing, and not the entire "Agreement." (Pls.' Mem. Opp'n Mot. Dismiss 9-10.) Section VII provides, in relevant part:

> The term of Kuhns Brothers' engagement hereunder shall extend from the date hereof

> until terminated as set forth below. Subject to the provisions of this Agreement that shall survive any termination or expiration of the understanding between the parties, either party may terminate Kuhns Brothers' engagement hereunder at any time by giving the other party at least 10 days written notice.

(Agreement 17.) This termination clause provides expressly only for the termination of the engagement, not the entire Agreement. (Id.)

The term "agreement," in its general sense, is defined as a "contract or agreement." See Black's Law Dictionary (8th ed. 2004). Within the contract, however, the term "Agreement," is specifically defined as the letter agreement between the parties, referring to the contract as a whole. (See Agreement 6.) The term "Agreement" is capitalized throughout the parties' contract, whereas "engagement" appears only in lower-case letters. The deliberate capitalization of the word creates a disparity from its use in a general sense. See Waldman v. Riedinger, 423 F.3d 145, 150-151 (2d Cir. 2005). The contract therefore creates a special meaning for the term "Agreement."

Unlike "Agreement," the term "engagement" is not specifically defined in the Agreement. Throughout the Agreement, the use of the word "engagement" indicates that it refers to the retention of Plaintiffs to perform specific tasks (i.e., investment banking services). The preamble uses the phrase "initial engagement" in the context of the Kuhns Entities arranging the financing and related merger acquisition services. (See Agreement 7.) If this engagement results in the "Closing," a two-year extension of Dalian Fushi's obligation to the terms of the Agreement arises. (See id.) The "engagement," therefore, appears to refer to a period of time that is shorter than the potential term of the Agreement, because it is described in the preamble as an initial period in which the condition precedent of the Closing may be fulfilled in order to initiate the

two-year extension. "Engagement," as used in the contract, does not clearly encompass the terms of the Agreement that will arise after the Closing, namely the parties' obligations under the two-year extension. (See id. at 13.)

Contrary to Defendant's assertion, the two terms are not used interchangeably; the differing meanings of the terms are juxtaposed twice in the contract. In addition to the preamble, Section V provides that Plaintiffs will provide services "subject to [Dalian Fushi's] continuation of its engagement of [Plaintiffs] as a financial advisor pursuant to the terms of this Agreement." (Agreement 15.) This indicates that "engagement" refers to the retention of services for a period of time, distinct from "Agreement," which refers to the contract as a whole. The paragraph that follows in Section V gives Dalian Fushi the right to terminate the engagement for cause, provided that Dalian Fushi "first gives [Plaintiffs] reasonable prior written notice (a minimum of fifteen days) of [Dalian Fushi's] intent to terminate the engagement." (Id.) The use of "engagement" here again indicates that termination for cause, as with the termination provision in Section VII, provides for the termination of something less than the "Agreement."

Other portions of the contract support the interpretation advanced by Plaintiffs. The title of the contract, "Engagement Agreement," suggests that the two terms have distinct meanings. To find that the two terms are interchangeable would mean that the title of the document as redundant and that one of the words is meaningless. See Hatcho Corp. v. Della Pietra, 195 Conn. 18, 20, 485 A.2d 1285, 1287 (1985) ("Parties generally do not insert meaningless provisions in their agreements and therefore every provision must be given effect if reasonably possible."). Moreover, the preamble states that the Agreement "will remain in force for a period of two years." (Agreement 7.) Similarly, Section II(iii)(a) provides that if the Closing occurs, a monthly

13

retainer "will be paid" to Plaintiffs for twenty-four months. (Agreement 13.) These phrases employ words—i.e., "will remain" and "will be"—that are mandatory in character, which strengthen the presumption of definiteness of their meaning and indicate a certainty, rather than a mere possibility, that the Agreement will remain in force for two years following the Closing. See Silano v. Sag Harbor Union Free School Dist. Bd. of Educ., 42 F.3d 719, 724 (2d Cir. 1994) (stating that language such as "shall"or "will" is unmistakably mandatory in character). The termination clause must be harmonized with the seemingly mandatory two-year term, so as to give effect to both clauses. See Hatcho Corp., 195 Conn. at 20 ("Parties generally do not insert meaningless provisions in their agreements and therefore every provision must be given effect if reasonably possible."); Mack Financial Corp. v. Crossley, 209 Conn. 163, 168-169, 550 A.2d 303 (1988) (same); United States Fid. & Guar. Co., 359 F. Supp. 2d at 200 ("the contract must be construed as a whole so that every provision is given effect, if reasonably possible"). A finding that once the Kuhns Entities complete the "engagement" by closing on the Financing, the Agreement "will remain" in force for two years would accomplish that purpose.[9]

The Agreement does not clearly and unambiguously permit either party to unilaterally terminate the entire Agreement upon ten-days notice, as Defendant argues. Rather, the language of the contract, specifically, the use of the words "engagement" and "Agreement," is ambiguous.

---

[9] Other provisions in the Agreement utilize the two-year period as the time that Defendant's obligations to Plaintiffs continue: (1) the Agreement provides that for twenty-four months following the Financing, Defendant will pay Plaintiffs $10,000 per month for strategic and financial advisory services, (Agreement 13), (2) the Agreement provides that for the two-year period following the Financing, Plaintiffs shall have the right to provide investment banking services to Defendant on an irrevocable preferential right-of-first-refusal-basis, (id. at 14). Additionally, the compensation due to Plaintiffs after the Financing was a significant part of their total compensation under the Agreement. Plaintiffs argue that "[i]t would be nonsensical to interpret the Agreement in a manner that would allow Defendant to terminate after Plaintiffs had performed in all material respects and deprive them of their compensation." (Pls.' Mem. Opp'n Mot. Dismiss 13-14.)

14

Therefore, the question of whether Defendant properly terminated the entire Agreement or whether Defendant has remaining obligations to Plaintiffs is a question of fact.[10] Accordingly, Defendant's motion to dismiss on this basis is denied.

2. Time Period to Effectuate Closing

Defendant alternatively pleads that the Amended Complaint should be dismissed because the condition precedent of the two-year extension, the Closing, did not occur within the initial six-month period described in the preamble. (See Def.'s Mem. Supp. Mot. Dismiss 8; Def.'s Reply 9.) It is undisputed that the Closing occurred seven months after the commencement of the Agreement, on December 28, 2005. (Am. Compl. ¶ 6.)

No provision in the Agreement expressly requires the Closing to be completed within six months. The preamble provides that Kuhns Brothers is engaged "initially for the six month period commencing the date hereof." (Agreement 7.) This, however, is the Agreement's only reference to a six month period, and the use of the word "initially" suggests that the engagement may extend beyond six months. The preamble further states that "[if] *as a result of* this initial engagement . . . Kuhns successfully arranges. . .[the Closing], this Agreement will remain in

---

[10] Defendant's argument that Plaintiffs, by their October 2, 2003 letter, accepted Defendant's termination letter has no merit. (See Def.'s Mem. Supp. Mot. Dismiss 3, 4, 9.) First, Plaintiff's letter is outside of the pleadings and cannot be considered on a motion to dismiss. See Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991) ("In determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."); Newman & Schwartz v. Asplundh Tree Expert Co., 102 F.3d 660, 662 (2d Cir. 1996) ("In considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference."). Second, the letter in no way accepts Defendant's termination, but rather seeks confirmation that Defendant would pay the same payments Plaintiffs are seeking in this action and requested that Defendant comply with its obligations under the Agreement. (See Kuhns Letter, Oct. 2, 2006, Ex. B to Def.'s Mot. Dismiss.)

15

force for a period of two years." (See id. (emphasis added).) This language suggests that the Closing need not occur within six months, but may arise "as a result of" the work done during the initial engagement. Therefore, it appears that a Closing occurring after six months, but "as a result of" the engagement, could still trigger the two-year extension. Section VII, moreover, provides that the "term of the Kuhns Brothers' engagement hereunder shall extend from the date hereof until terminated." (Agreement 17.) This provision makes no mention of the six-month period, but rather allows the engagement to continue for an unspecified time if not terminated by Dalian Fushi. The Agreement, therefore, does not appear impose a six-month deadline for Plaintiffs to effectuate the Closing.

As with the previous question, however, the question of whether the Agreement imposes a six-month deadline is ambiguous from the language of the contract. Extrinsic evidence, going to show the parties' intent and understanding of the Agreement's meaning as demonstrated by their actions and other evidence, would be helpful to this interpretation. See Saturn Const. Co., Inc. v. State Dept. of Public Works, No. CV-93-0704690-S, 1994 WL 590604, at *9 (Conn. Super. Ct. Oct. 17, 1994) ("extrinsic evidence cannot be considered on a question of contract interpretation unless the contract itself is ambiguous"); Issler v. Issler, 250 Conn. 226, 235, 737 A.2d 383 (1999) ("A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . ."). Because extrinsic evidence is not properly considered on a Rule 12(b)(6) motion to dismiss, and because this is a question of fact, the Court

need not decide the issue at this time. Accordingly, Defendant's motion to dismiss is denied.[11]

## VI. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss [Doc. No. 16] is **denied**. Because the Motion to Dismiss has been decided, Defendant's Motion for Reconsideration [Doc. No. 48] of this Court's Order denying its Motion for Extension of Time is **denied as moot**. Defendant shall respond to Plaintiffs' Motion for Prejudgment Remedies [Doc. No. 25] and Motion to Amend Complaint [Doc. No. 22] within ten days of the date of this Ruling.

SO ORDERED.

Dated at New Haven, Connecticut, July  14 , 2007.

/s/
Peter C. Dorsey, U.S. District Judge
United States District Court

---

[11] The Court need not address the rule of *contra preferentum*, requiring any ambiguity in a contract to be construed against the drafter, at this time. The rule of *contra preferentum* "is a rule of last resort, only utilized when all aids to construction have been employed and have failed to resolve the ambiguity." United Techs. Corp. v. American Home Assur. Co., 989 F. Supp. 128, 145 n.19 (D. Conn. 1997)