UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KUHNS BROTHERS, INC., KUHNS BROTHERS SECURITIES CORP., and KUHNS BROS. & CO. INC., Plaintiffs, | : : : : : | |
| v. | : : | Civil No. 3:06cv1917 (PCD) |
| FUSHI INTERNATIONAL, INC. and DALIAN FUSHI BIMETALLIC MANUFACTURING COMPANY LTD., Defendants. | : : : : | |

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Kuhns Brothers, Inc., Kuhns Brothers Securities Corp., and Kuhns Bros. & Co. Inc. (collectively, "Kuhns" or "Plaintiffs") bring this action seeking declaratory judgment and alleging breach of contract of an agreement to provide investment banking services. Defendants Fushi International, Inc. ("Fushi") and Dalian Fushi Bimetallic Manufacturing Company Ltd. ("Dalian Fushi") (collectively "Defendants") move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment as to all claims against Defendants, alleging that Plaintiffs lack standing to bring a breach of contract claim against Fushi and that the contract between Dalian Fushi and Plaintiffs was properly terminated by Dalian Fushi. For the reasons stated herein, Defendants' motion for summary judgment [Doc. No. 155] is **denied**.

### I.     Background

Because this case is at the summary judgment stage, the Court will view the record in the light most favorable to Plaintiffs, as the non-moving party. See Terry v. Ashcroft, 336 F.3d 128, 139 (2d Cir. 2003).

Plaintiffs have brought breach of contract claims against Defendants, seeking damages of

at least $7,500,000, plus costs and attorneys' fees. Plaintiffs' breach of contract claims arise from Defendants' repudiation of its alleged obligation to pay Plaintiffs a monthly retainer for two years following the closing, from Defendants' exercise of warrants issued at the closing, and from the Citadel and Copperweld transactions. Plaintiffs also seek declaratory judgment with respect to termination of the contract and the provisions for indemnification thereunder. (Third Amended Compl.) [Doc. No. 103.] Defendants have filed counterclaims asserting breach of contract and seeking damages in excess of $160,000, plus costs and attorneys' fees, as well as declaratory judgment regarding the termination of the contract. (Answer to Third Amended Compl., and Counterclaim.) [Doc. No. 115.] The case is currently before the court on Defendants' motion for summary judgment with respect to all of Plaintiffs' claims. Plaintiffs have not filed a cross-motion for summary judgment.

By written agreement (the "Agreement") dated May 27, 2005, Defendant Dalian Fushi retained Plaintiffs to provide investment banking and advisory services and to effectuate a financing and related merger transaction. The preamble to the Agreement reads:

> The Company hereby engages Kuhns Brothers on an exclusive basis, initially for the six month period commencing the date hereof, to provide it with investment banking services, and Kuhns Brothers hereby accepts such engagement. In the event [that] as a result of this initial engagement Kuhns Brothers successfully arranges and [closes] the financings and related merger acquisition described below ("the Closing"), this Agreement will remain in force for a period of two years following the closing of such financing and related transactions.

Plaintiffs completed the financing, raising $12 million, and the Closing occurred on December 28, 2005. Section II(iii)(b) of the Agreement provides:

> [C]ommencing upon the closing(s) of the Financing, a non-refundable monthly retainer of $10,000 per month, payable on the first of the month, will be paid to Kuhns Brothers for 24 months for strategic and financial advisory services.

2

Plaintiffs maintain that completing the Closing entitles them to payment of the retainer for two years. Defendants paid the monthly retainer through August 29, 2006, when Dalian Fushi sent a notice to Plaintiffs, on Fushi's letterhead, claiming to exercise the right to terminate the Agreement pursuant to Section VII, which provides in relevant part:

> The term of Kuhns Brothers' engagement hereunder shall extend from the date hereof until terminated as set forth below. Subject to the provision of this Agreement that shall survive any termination or expiration of the understanding between the parties, either party may terminate Kuhns Brothers' engagement hereunder at any time by giving the other party at least 10 days written notice.

Defendants have since refused to pay the $10,000 monthly retainer, to which Plaintiffs claim they were entitled through December 27, 2007.

Plaintiffs further claim that in 2006 and 2007, Defendant Fushi raised approximately $7.05 million through the exercise of warrants issued at the Closing, and that Plaintiffs are therefore entitled pursuant to Section II(i)(d) to a fee of 10% of the proceeds of the warrant exercise, for a total of $705,525.50. (Third Am. Compl. ¶ 19.)

On January 25, 2007, Defendants consummated a transaction with Citadel Equity Fund, Ltd. ("Citadel"), pursuant to which Defendants obtained $60 million of financing through Citadel's purchase of Defendants' secured notes (the "Citadel Transaction"). Defendants did not request that Plaintiffs provide investment banking services for the Citadel Transaction, as Plaintiffs contend was required under Section V of the Agreement, which provides in relevant part:

> The Company agrees that Kuhns Brothers shall have the right . . . to provide investment banking services to the Company on an irrevocable preferential right of refusal basis to provide such services in relation to the Company's financing for the term of this Agreement and such additional period of time as may be necessary to complete any

3

project or Transaction already commenced pursuant to the Company's written request or engagement of Kuhns Brothers prior to the expiration of such 2 year period.

Section II(i) of the Agreement requires Defendants to pay Plaintiffs a fee equal to 50% of the compensation that would be due if Plaintiffs had introduced Citadel to Defendant. Specifically, Section II(i) states:

> [I]f during 2 years from the execution of this contract a Financing is consummated with a third party not introduced to the Company by Kuhns Brothers, Kuhns Brothers will be paid a fee equal to 50% of its compensation due pursuant to the language above.

Defendants have refused to pay this financing fee, which, with regard to the Citadel Transaction, Plaintiffs claim is approximately $3 million. (Third Am. Compl. ¶ 18.)

In September 2007, Defendant Fushi acquired Copperweld Bimetallic, LLC ("Copperweld") for approximately $22.5 million. Plaintiffs claim that they "introduced" Copperweld to Defendants, and are therefore entitled to compensation pursuant to Section II(i):

> [I]f during the period Kuhns Brothers is retained by you, a Financing is consummated with a third party...who was introduced directly or indirectly by Kuhns Brothers ("Introduced Investors"), or if the Company enters into a definitive agreement with Introduced Investors which at any time thereafter results in a Financing, you will pay Kuhns Brothers a financing fee equal to the fees indicated above with respect to such Financing.

Section II(i) defines "introduced" as follows:

> Kuhns Brothers shall be deemed to have introduced such Introduced Investors to the Company not only by physical introductions and meetings, but also by arranging or facilitating telephonic or correspondence meetings between the parties, whether or not Kuhns Brothers participated in such meetings, telephone calls or correspondence.

In April 2006, Mr. Kuhns called Steven Levy of Copperweld, saying that he "represented a party who would be potentially interested in acquiring" Copperweld. (Kuhns Dep. at 189.) Mr. Kuhns reports that Mr. Levy was receptive to the idea. Id. Defendants contest that this exchange constituted an "introduction" because Mr. Kuhns did not then identify Defendants as the

4

interested party, and because Plaintiffs had no further contact with Copperweld. Plaintiffs respond that they were instructed by Defendants to have no further discussions with Copperweld, but that Defendants resumed discussions with Copperweld themselves, after terminating the contract with Plaintiffs. Plaintiffs seek a fee of approximately $725,000 with respect to the Copperweld transaction. (Third Am. Compl. ¶ 20.) Plaintiffs contend that even if they are found not to have "introduced" Copperweld, they are nonetheless entitled to half that amount, or approximately $362,500, pursuant to the compensation provisions described above, which apply to non-introduced third parties. Id.

**Background Regarding Relationship of Fushi and Dalian Fushi**

On November 8, 2005, Dalian Fushi acquired 20,000,000 shares of Parallel Technologies, Inc., taking control of that entity. On December 5, 2005, Parallel Technologies changed its name to Fushi. On December 13, 2005, Fushi exchanged shares of its stock to acquire two corporate entities previously formed by Dalian Fushi, making those entities wholly owned subsidiaries of Fushi. Fushi, under the control of Dalian Fushi's shareholders, caused one of the subsidiaries, Dalian DPI, to enter into an agreement with Dalian Fushi to purchase substantially all the assets of Dalian Fushi and lease the remaining assets. Dalian Fushi's wire manufacturing operations were transferred to Dalian DPI, a wholly owned subsidiary of Fushi. (See Memo. Opp. Mot. Summ. J. at 15-16; Def.'s Reply at 3-4.) Plaintiffs contend that Dalian DPI now operates the wire manufacturing business while Fushi performs corporate activity to continue Dalian Fushi's business, including raising capital, accounting, administration, and making SEC filings. (Memo. Opp. Mot. Summ. J. at 32.) Plaintiffs also contend that Fushi controls the now-dormant Dalian Fushi through a Management Agreement; Defendants contest the characterization of Dalian

5

Fushi as dormant. (Memo. Opp. Mot. Summ. J. at 16.)

## II. Standard of Review

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, "[c]onclusory allegations will not suffice to create a genuine issue." Delaware & H.R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990). The moving party bears the burden of establishing that summary judgment is appropriate. Anderson, 477 U.S. at 225. "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).

## III. Discussion

### A. Standing

While there is no question that Plaintiffs have standing to sue Defendant Dalian Fushi, as

6

a party to the contract at issue, Defendants assert that summary judgment should be granted as to all claims against Defendant Fushi, because Plaintiffs lack standing to bring an action on the contract where there is no privity of contract. Specifically, Defendants argue that Plaintiffs cannot demonstrate that Fushi is a successor to Dalian Fushi so as to establish standing and privity of contract. Both parties point to the following test under Connecticut law, which provides for successor liability where: (1) the purchase agreement expressly or impliedly so provides; (2) there was a merger or consolidation of the two firms; (3) the purchaser is a 'mere continuation' of the seller; or (4) the transaction is entered into fraudulently for the purpose of escaping liability. Ricciardello v. J.W. Gant & Co., 717 F. Supp. 56, 58 (D. Conn. 1989); Collins v. Olin Corp., 434 F. Supp. 2d 97, 102 (D. Conn. 2006); Union Square Grill Hospitality Group, LLC v. Blue Smoke American Bar & Grill LLC, 2007 WL 869024, at *2 (D. Conn. Mar. 19, 2007). "In order to determine whether successor liability may be imposed..., the Court must 'examine the substance of the transaction to ascertain its purpose and true intent.'" Collins, 434 F. Supp. 2d at 102 (quoting National Grange Mutual Insurance Company v. Montgomery Elevator, 1994 WL 547747, at *4 (Conn. Super. Ct., Sept. 22, 1994) (citations omitted)).

As Plaintiffs have not asserted the applicability of the first or fourth bases for liability, only the existence of a de facto merger or continuation between Dalian Fushi and Fushi are at issue here. "For the purposes of determining successor liability, analysis of a 'mere continuation' and a 'de facto merger' may be treated together." Collins, 434 F. Supp. 2d at 103 (citing Peglar v. Professional Indemnity Underwriters Corp., 2002 WL 1610037, at *6-7 (Conn. Super. Ct. June 19, 2002)). "[T]he consideration of whether a "de facto merger" or a "mere continuation" of the former entity has occurred requires the weighing of four factors:

7

> (1) continuation of the enterprise of the seller corporation so that there is a continuity of management, personnel, physical location, assets and general business operations; (2) continuity of shareholders; (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; (4) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

Collins, 434 F. Supp. 2d at 103 (citing Peglar, 2002 WL 1610037, at *7). Defendants maintain that "all four factors must be satisfied" (Memo. Supp. Mot. Sum. J. at 20) (emphasis in original), while Plaintiffs contend that "[i]t is not necessary for each of the indicia of continuity to be established. Rather, the court should apply a balancing test." (Memo. Opp. Mot. Sum. J. at 30.) Plaintiffs' is the better statement of Connecticut law. See Peglar, 2002 WL 1610037, at *7 ("not every one of these indicia must be established.... the court should apply more of a balancing test"); Savings Bank of Manchester v. Daly, 2004 WL 3130581, at *8 (Conn. Super. Ct., Dec. 23, 2004) ("Analysis of the necessary factors should be undertaken in a flexible, realistic manner, focusing on intent."). Indeed, Savings Bank of Manchester suggests that the factors enumerated above may not be an exhaustive list of the appropriate considerations. 2004 WL 3130581, at *3 (listing the four factors above after stating that "the Court should consider the following factors, among others" (emphasis added)). Union Square Grill states that "[c]ontinuity between predecessor and successor is determined under a balancing test with four nondispositive factors." 2007 WL 869024, at *2.

In support of the position that all four factors must be present, Defendants rely on the Southern District of New York's statement in Cargo Partner AG v. Albatrans Inc. that "[t]he [Second Circuit] has consistently ruled and affirmed that all of these factors 'must' be satisfied." 207 F. Supp. 2d 86, 100 (S.D.N.Y. 2002) (citing Arnold Graphics Indus. v. Independent Agent

Ctr., 775 F.2d 38, 97 (2d Cir. 1985)). However, following that decision, the following question, which is directly on point, was certified to the Second Circuit in an interlocutory appeal:

> "Whether the New York State Court of Appeals would apply the weighing of four factors recognized by the Courts of the State of New York as potentially applicable to whether the 'de facto merger' exception applies to a transaction styled as a sale of assets, or whether that Court would adopt a definition of the 'de facto merger' exception as requiring that a plaintiff must plead and prove all four of those four factors."

Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41, 44 (2d Cir. 2003). This involved the application of New York law, rather than Connecticut law as here, but the answer is nonetheless instructive, as the test is similar. The Second Circuit held that:

> "We have no need to resolve the asserted conflict between Arnold and Fitzgerald[1] or determine whether all four factors must be present for there to be a de facto merger. Whichever test applies, we are confident that the doctrine of de facto merger in New York does not make a corporation that purchases assets liable for the seller's contract debts absent continuity of ownership."

Cargo Partner, 352 F.3d at 46. The Second Circuit further noted that "Continuity of ownership might not alone establish a de facto merger, but... it *is* the substance" of a merger. Cargo Partner, 352 F.3d at 47 (quoting Cargo Partner, 207 F. Supp. 2d at 104 (emphasis in original)(internal quotations omitted)). The Court further stated that "continuity of ownership" is effectively the same as "continuity of stockholders." Cargo Partner, 352 F.3d at 47 ("the former is simply a more general way to state the latter").

The first prong of the test requires continuation of the enterprise of the seller corporation so that there is a continuity of management, personnel, physical location, assets and general business operations. Plaintiffs offer evidence that Dalian Fushi's senior executives became

---

[1] Fitzgerald had held that "not all of these elements are necessary to find a de facto merger." Fitzgerald v. Fahnestock & Co., 286 A.D.2d 573, 574-75, 730 N.Y.S.2d 70, 71 (1st Dep't 2001).

9

senior executives of Fushi, and that the offices of Dalian Fushi became those of Fushi.

Defendants argue that the assets and wire-making business of Dalian Fushi were transferred to Fushi subsidiary Dalian DPI, rather than directly to Fushi.[2] Plaintiffs concede that subsidiary Dalian DPI continued Dalian Fushi's wire manufacture. However, Plaintiffs assert that Fushi performs corporate activity to continue Dalian Fushi's business, including raising capital, accounting, administration, and making SEC filings. (Memo. Opp. Mot. Summ. J. at 32.) Plaintiffs further note that until acquiring Dalian Fushi's business in December 2005, Fushi had no business operations, assets, or liabilities of its own. (Memo. Opp. Mot. Summ. J. at 16.) The evidence is mixed as to the satisfaction of the first prong.

Shareholder continuity is the second prong of the test. Plaintiffs contend that Defendant Fushi "assumed control over Dalian Fushi's business, in a transaction where the same persons acted for both entities, [and that] there is a complete overlap between the controlling shareholders, officers and directors of the two entities." (Memo. Opp. Mot. Summ. J. at 2.) Defendants essentially concede the point, arguing that, "On balance, Plaintiffs debatably satisfy only one of the four required elements - the continuity of shareholders." (Reply Mem. Supp.

---

[2] Defendants place great emphasis on the Court's statements in its Ruling on Motion for Preclusion [Doc. No. 153] that Dalian DPI is Fushi's wholly owned subsidiary and that Dalian Fushi's assets were transferred to Dalian DPI. Defendants argue that the statements constitute a finding that is dispositive in favor of Defendants on the issue of successor liability. In that decision, the Court found that because of the degree of ownership and control exercised by a parent over a subsidiary, Fushi could potentially be held responsible for failing to obtain from Dalian DPI documents that were relevant to Plaintiffs' discovery requests. That ruling on a motion for preclusion based on alleged discovery noncompliance is essentially irrelevant to this motion for summary judgment, especially in light of the fact that in that ruling, the Court denied Plaintiff's motion for preclusion on the issue of successor liability, expressing a preference to resolve the issue on the merits. Nonetheless, Defendants now suggest that the ruling effectively precludes Plaintiffs from successfully asserting successor liability, which is a construction the Court does not give that ruling.

Mot. Summ. J. at 6.) Thus, while the degree of shareholder continuity may be in dispute, there is evidence demonstrating at minimum a significant degree of shareholder continuity. As discussed above, shareholder continuity has been identified by courts considering this issue as an important factor in the balancing test for finding successor liability.

The third prong of the test is a consideration of whether the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible. Defendants contend that Dalian Fushi still exists, thus defeating a finding for Plaintiffs on this prong, while Plaintiffs contend that Dalian Fushi is dormant and that Dalian Fushi's operations are controlled by Fushi's board through a Management Agreement. In response to the question, "Did Dalian Fushi have any ongoing business activities after December 2005?," Defendants' witness Wenbing Chris Wang responded, "It's materially not operating, but Dalian Fushi still exists. Their assets–their–you know, their liabilities, it still exists." (Wang Dep. at 116.) This answer, which is cited by both sides in support of their positions with respect to the third prong of the test, and which simultaneously asserts that the company is "materially not operating" and "still exists" with assets and liabilities, creates an issue of fact regarding the current operational status of Dalian Fushi.

The fourth prong of the test inquires whether there has been an assumption of the liabilities and obligations of the selling corporation. Plaintiffs state that Fushi, through its subsidiary Dalian DPI, continued to pay the trade creditors of Dalian Fushi. Defendants argue that such acts done by Dalian DPI do not constitute acts by Fushi. In response, Plaintiffs contend that Fushi itself has honored many aspects of the contract at issue in this case, and that contract was an obligation of Dalian Fushi's for which Fushi assumed functional responsibility. Plaintiffs

11

state that, "Defendant Fushi, not Dalian DPI, has honored significant aspects of the Engagement Agreement. Defendant Fushi paid the Kuhns Firm its fees from the successful closing; it fulfilled the contractual obligation of permitting a representative of the Kuhns Firm to serve on its Board; the termination notice was sent on Fushi's letterhead; and Fushi's SEC filings state that it must pay the Kuhns Firm fees upon the exercise of warrants placed in December 2005." (Memo. Opp. Mot. for Summ. J. at 32-33.) The evidence is also mixed as to the fourth prong.

On balance, there is sufficient evidence supporting Plaintiffs' contention that Fushi is a successor to Dalian Fushi to make it inappropriate to grant Defendant Fushi's motion for summary judgment with respect to all claims against it.

### B. Contract Termination

Defendants argue that summary judgment should be granted because there is no genuine issue of material fact as to whether Dalian Fushi properly terminated the contract on ten days notice. However, this is not a case where "the moving party [has met] the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005). In addition to raising disputed issues of fact, Plaintiffs have challenged the credibility of certain witnesses whose testimony provides key support for Defendants' interpretation of the contract. A federal trial court errs in making a credibility determination on a motion for summary judgment. Dingle v. Zon, 189 Fed. Appx. 8, 11 (2d Cir. 2006), citing Beatie v. City of New York, 123 F.3d 707, 710 (2d Cir. 1997).

Defendants argue that Christopher Bickel, as an agent for Plaintiffs, made repeated oral representations to Defendants that they could terminate the contract at any time upon ten days

written notice, and that Defendants would not have entered into the contract but for these assurances, because they were concerned about the fixed two year exclusive engagement with Plaintiffs that the closing would otherwise trigger. Plaintiffs respond that the ten day termination provision applied only to the initial six month period of the engagement, prior to the closing of the financing. Plaintiffs' reading of the contract is bolstered by the presence of another provision requiring that, after the financing, Defendants must give Plaintiffs at least 15 days written notice explaining why they were terminating their services for cause, and giving Plaintiffs a chance to cure any defects prior to termination. The relevant portion of Section V provides:

> For the purpose of this agreement, "cause" means the failure by Kuhns Brothers to perform in a material respect its obligations hereunder in accordance with the skill and diligence normally provided by recognized investment banking companies; <u>provided, however</u>, that the Company shall first give Kuhns Brothers reasonable prior written notice (a minimum of fifteen days notice) of the Company's intent to terminate the engagement (such notice to specify in reasonable detail the facts alleged to give rise to the Company's right to terminate for cause) and shall have provided Kuhns Brothers a reasonable opportunity to cure by performing such obligations...

This provision would seem to be redundant if the ten day termination clause applied to the entire contract.

In ruling on Defendants' motion to dismiss, the Court set forth an alternative to Defendants' reading of the contract. <u>See</u> Ruling on Motion to Dismiss. [Doc. No. 53.] This plausible alternative reading precluded a finding at that stage that the contract had clearly been terminated properly as a matter of law, as Defendants had argued in their motion to dismiss. The Court found that the terms of the contract were sufficiently ambiguous that Defendants were not entitled to dismissal as a matter of law, and concluded that the record would benefit from extrinsic evidence as to the parties' intent, which the parties have sought to provide here, and some of which is discussed in more detail below. Contrary to the implication in some of the

13

briefs, the fact that the language in the contract at issue was found sufficiently ambiguous to defeat Defendants' motion to dismiss does not mean that the contract language is irrelevant to the Court's analysis moving forward, or that only extrinsic evidence may be considered.

Defendants also argue on motion for summary judgment that they properly terminated the contract because the closing was completed in December, seven months after the contract was signed, rather than within six months of the contract signing. Defendants raised this issue in their motion to dismiss, and the Court found the provision sufficiently ambiguous to permit extrinsic evidence on the question. However, Defendants have produced no extrinsic evidence supporting their reading of the six month period as a drop dead date for completing the financing under the terms of the contract. The issue may be immaterial, since it appears that Defendants waived their objection to the timeliness of the closing, if they had any legitimate such objection pursuant to the terms of the contract, by making for several months thereafter the monthly retainer payments to Plaintiffs that were contemplated by the contract as being due upon successful completion of the Financing.

**Evidence Relating to Christopher Bickel**

Christopher Bickel, Chief Executive Officer of Redwood Capital, Inc., played a role in the negotiation of the contract. Plaintiffs characterize him as a "finder" and Defendants describe him as an "agent" of Plaintiffs. The Memorandum of Understanding, dated May 14, 2005, by which Plaintiffs engaged Mr. Bickel's services, provided as follows:

> Redwood has or shall...[n]egotiate fee terms and conditions regarding the Financing and the services of the Parties with [Dalian Fushi], resulting in an engagement between [Dalian Fushi] and Kuhns Brothers substantially in the form of the Engagement Agreement attached hereto.

During his deposition testimony, Mr. Bickel responded in the affirmative when asked,

14

"Did you make any representations to anyone at Dalian Fushi that they could terminate this entire contract on 10 business days notice?" (Bickel Dep. at 64.) When further asked, "Do you know, if that representation hadn't been made, that Dalian Fushi would not have entered into this contract?," Mr. Bickel replied, "Yes." Id. He also testified that he was authorized by Plaintiffs to make such representations. Id.

Plaintiffs point out that the relatively extensive notes that Mr. Bickel kept during the negotiations do not appear to make any mention of his assurances regarding the option to terminate the contract at will upon ten days notice. There are, however, notes suggesting that the parties discussed the "2 years thereafter" and a "15 days written notice [provision] on page 15, paragraph 3." (Pl.'s Ex. 17, May 30, 2005 notes, numbered points 4 and 5.) Bickel acknowledged in his deposition testimony that there are multiple termination provisions within the contract. (Bickel Dep. at 61-62.) Plaintiffs assert that there would be little need to negotiate the 15 day notice provision or many other contract provisions appearing to create obligations on Defendants during the two year period following the Financing if the entire contract were terminable upon ten days notice.

Plaintiffs question the credibility of Mr. Bickel's testimony, pointing to several facts which they claim give him an incentive to cooperate with Defendants and to offer testimony adverse to Plaintiffs' interests. Bickel testified that he "had an interest in or was a controlling principal owner" of a company called World Creation Investment, Ltd., which at the time of his deposition had brought an arbitration and was engaged in litigation against Kuhns in another matter. (Bickel Dep. at 145-46.) Plaintiffs further note that Bickel has worked with Defendants' law firm on a number of other matters. (See Bickel Dep. at 140, stating that the law firm

representing Defendants in this matter has acted as corporate counsel on the majority of deals in which Bickel has played a role.)

**Evidence Relating to Wenbing Chris Wang**

Wenbing Chris Wang, currently Chief Financial Officer of Fushi and Defendants' Rule 30(b)(6) witness, testified that Dalian Fushi was assured that it could terminate the contract upon ten days notice, and that it was not bound to a two year term. With regard to Li Fu and Yue Mathus Yang, who were directors and executive officers of Dalian Fushi, Wang testified that, "If they could not get out of this two-year lockup, they would not have signed this [contract]. (Wang Dep. at 60.) Wang further testified that Bickel told Fu and Mathus Yang, "Look, ten days termination notice. No strings attached. No obligations. You can terminate this within ten days." (Wang Dep. at 63.) It is perhaps notable that during much of the negotiations, Mr. Wang acted as the translator between Bickel, who does not speak Chinese, and Fu and Mathus Yang, who do not speak English. (Wang Dep. at 63.)

To contest Wang's representation of Defendants' understanding of the termination provision at the time of signing, Plaintiffs point to emails sent in July 2006 between Mr. Wang, William Wells of Pope Asset Management, and Beau Johnson of Chinamerica Partners, LP. These emails contain discussions of how to get out of the contract with Kuhns and appear to evince an understanding that a binding two year contract term was in effect. (See Pl.'s Exs. 57, 58.) Such a discussion would presumably be unnecessary if they understood the contract to be terminable at any time upon ten days notice. Defendants respond that Mr. Johnson did not recall reading the contract at the time of these emails. (Def.'s Reply at 12.)

Finally, as discussed above with respect to his comments on Dalian Fushi's current

operational status, Mr. Wang's testimony at deposition is occasionally unclear or self-contradictory. Plaintiffs also point to an instance where Mr. Wang's deposition testimony conflicts with an email he sent. Mr. Wang stated during deposition that he became Dalian Fushi CFO in March 2005, which would have been before the contract was signed on May 27, 2005. (Wang Dep. at 21.) However, Mr. Wang wrote to Mr. Kuhns on November 13, 2005 that, "As you know, I came on board Dalian Fushi as CFO, <u>after</u> the contract is [sic] signed." (Pl.'s Ex. 51) (emphasis in original). Plaintiffs suggest that this discrepancy goes to Wang's credibility. Without knowing Mr. Wang's level of fluency in English, the Court entertains the possibility that being deposed in English posed some difficulty for him and potentially caused some of the deficiencies in his testimony. Nonetheless, as the Court has observed in previous rulings in this case, during deposition Wang was repeatedly interrupted by his counsel before he could answer important questions, with counsel raising objections that effectively cued the witness regarding how to answer. (<u>See</u> Wang Dep. at 58-59, 60-61, and Doc. No. 153 at 6.) Given that, and in light of the credibility issues and factual disputes raised by Plaintiffs, the Court would find it helpful to hear the various witnesses' testimony firsthand.

## IV. CONCLUSION

While this order sets forth disputed issues of material fact sufficient to defeat Defendants' motion for summary judgment, it is not an exhaustive statement of all material issues that are in dispute. Defendants' motion for summary judgment [Doc. No. 155] is **denied**.

SO ORDERED. Dated at New Haven, Connecticut, May  20 , 2008.

/s/
Peter C. Dorsey, United States District Judge
District of Connecticut